Good morning, your honors. My name is Adam Gassner, and I represented Victor Torres down below in the trial court. Can you speak into the mic? Absolutely. Good morning, your honor. I represented Victor Torres in the trial court, and I do here again today because this case is about fundamentally equal protection under the laws. Title 18, United States Code 922G5 seeks to prevent, based on status alone, Victor Torres, as well as perhaps at a minimum 13 billion people here in this country, from the right to defend themselves under the Second Amendment in the privacy of their own homes and other places. The Second Amendment applies to undocumented people. The First Amendment, the vows of the Bill of Rights apply to undocumented. The myriad of protections offered undocumented under the First Amendment are unquestioned. The troika of criminal law amendments that I work with every day, the Fourth Amendment, the Fifth Amendment, and the Sixth Amendment, including as well, parenthetically, the Eighth Amendment and the Fourteenth Amendment, all applied undocumented. I represent them on an appointed basis all the time. The Second Amendment is also a substantial right to be conferred on all people in this country. The Heller case pointed out that it's a individualized right aimed towards the ability of one to protect oneself in a privacy of their own home with a firearm and elsewhere. Well, it doesn't seem to me that Heller or Verdugo really answer the question. They give us, if you will, glimpses, but they don't really answer the question. It seems to me that Verdugo says the test is for the first, the second, the fourth, maybe the ninth and tenth, refers to a class of persons who are a part of a national community or who have otherwise developed sufficient connection with this country. Thank you, yes, your honor. The undocumented people in this country are a member of our national community. Well, but just a minute, I guess I'm having a tough time understanding how they are. For instance, right in Verdugo, it says, quoting United States X-ray, Turner versus Williams, excludable alien is not entitled to first amendment rights because he does not become one of the people to whom these things are secured by our constitution by an attempt to enter forbidden by law. Thank you, your honor. I do believe fundamentally in opposition to the alien as a right to assemble to free speech and to freedom of religion. If you read Turner, that's exactly what it says. I do, and I understand that that's the statement in Verdugo, but I believe that constitutional interpretation of the first amendment extends to undocumented Mr. Turner. Let's go on with another case. How about Bridges versus Wixom? Bridges versus Wixom is trying to decide another issue, and they say the Bill of Rights is a feudal authority for the aliens seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country, he becomes invested with the guaranteed by the constitution. So, again, in Bridges, we're not talking about just entering, we're talking about lawfully entering. And if we take that back and put it in the middle of Torres, it seems, again, we have to say they're part of the national community where they develop sufficient connection with this country. Now, the sufficient connection with this country is the important part because it seems to me that one does not develop such sufficient connection unless one has some legal right to be here. I disagree that you cannot establish a sufficient connection. Well, give me the case. But I mean, all I'm trying to do is read you the cases and let you explain these interwoven ideas because it seems to me that I've got to start with Verdugo and then I've got to apply Heller. Heller doesn't talk about people. It talks about citizens and it talks about people who are duly good, virtuous Americans. It even talks about Americans. But if we go back to Verdugo, it kind of lays it out. And so I'm trying to determine how I get the sufficient connection to be considered part of the community. Thank you, your honor. Mr. Torres himself is an example of a child that was carried here in the arms of his parents, went to school here, lived here, had some employment here. But does that make it a connection? He didn't take any steps to to make his status lawful. I mean, he became an adult and he did nothing to make that status lawful. I agree, your honor. His wife is an American citizen. There are things that financially or legally he could have done probably to attain status would have prevented this case from going to court. And at the level that it did, there are certainly other statutes, other criminal laws that he broke. That's certainly true, but we're not talking about any of those. We're talking about now which is criminalized because you said that he didn't he wasn't a citizen. He wasn't lawfully admitted. Right. But he could have. He could have been lawfully admitted. He could have sought lawful admission. The fact that he was brought here as a child didn't change that. No. When he turned 18, he could have voluntarily deported himself or he could have otherwise taken steps towards lawful citizenship. This is a man with no pre-existing criminal record. Oh, just a minute. There is just a little bit more history here than you want to admit to. I mean, we know the parts you've talked about thus far, but you haven't talked about that in 2002, he was expelled, that he returned to Mexico, that he reentered three times after becoming an adult. Every time he was allowed to return to Mexico, so he went. So he understood the whole of the process. He understood he had no, if you will, sufficient connection with the country to be considered a part, and now you want to make him a part. Your Honor, he grew up in San Jose, California. His parents live and his siblings live in San Jose, California. He went to school from the time he was a school-age boy in that county. This is the language that he knew, the people that he was friends with, the family that he had and that he knew. Nevertheless, he was subject to deportation as his neighbors were not. So he was subject to certain legal disabilities, but his dad didn't choose rights. He had no, he had never illegally, he was never prosecuted for illegal re-entry. He had no other reasons that would prevent him from being in the country. He could have sought legal status, there is no doubt. But he didn't. But he did not. You've got about a minute left. Can I just throw out a different question, and that is, what are your thoughts on the approach of the Tenth Circuit and the concurrence of the Seventh in which the court avoided the whole Second Amendment question, applied the analysis then with the assumption that it would apply in the intermediate scrutiny? Why wouldn't that allow the law to be upheld? Your Honor, I believe preliminarily that with regard to the Bill of Rights, that strict scrutiny should be applied in this case. Then why is that? Because it's applied in the context of all the other constitutional rights that are conferred to people under the Bill of Rights, pre-existing rights. In other words, it's not like a right to vote or otherwise that are constitutional rights. This is a pre-existing inalienable right based on the Second Amendment, which was written, of course, at the same time the Fourth, Second, and First were written, which all confer these rights on the people, meaning people that are here within these boundaries. Of course, when those words were written, there was probably no question that it wasn't a question of documentation, that if you were present on these shores, you had the right to defend yourself with a firearm. And indeed, I understand the reticence. I'm not seeking to arm 13 million undocumented people with this, I'm not asking this law to be unconstitutional, but what I'm trying to do is seek to have the same laws applying equally among the people that are here. There has been no pre-existing findings. Well, that's a consequence of your argument, isn't it? No, Your Honor. Presumably, those who are admitted here lawfully, and particularly U.S. citizens, can arm themselves. I mean, subject to regulations, but you want to give the same rights to uh, those who are not, I mean, 13 million, whatever that number is, right? What I'm trying to do, yes. Your time is up. Let's hear from the government. Thank you. Thank you very much for the opportunity, Your Honors. Good morning, Your Honors. May it please the Court, Bill Gulotta on behalf of the United States. Every court that has considered the constitutionality of 922g5 has upheld it. In every section, in fact, every section of 922g that has been challenged on Second Amendment grounds following Heller has been upheld. Since Heller, the five courts, as we noted in our brief, have considered the constitutionality under the Second Amendment of Section 922g5, and each one of those courts has found it to be constitutional. Now, three of those courts only dealt with the first step of the post-Heller analysis, which is to determine whether or not unlawful or unauthorized aliens even have rights under the Second Amendment. The Tenth Circuit, as the Court noted already, passed on that issue and assumed for the sake of the argument that they may have rights under the Second Amendment, but upheld the law under intermediate scrutiny because it is substantially related to an important government purpose. So, how do you get to this, the people? I think, I mean, I've read what these other courts have done, but I'm not sure they've really sufficiently analyzed that language. I mean, I read your brief. You said that the Supreme Court's use of law-abiding or responsible citizen from Heller was the way to deal with people, but I'm not convinced it might have something to do with a part of the political community, but I'm not convinced that it's about connection. Otherwise, if that phrase defines the people, then citizen misdemeanors would be similarly excluded, would they not? Yes, Your Honor. And they're not under Ninth Circuit law? I think the phrase, the problem with the defendant's argument about the people, that it should have the same meaning in every instance of its usage in the Constitution, is sort of twofold. Number one, we know that there are other provisions in the Constitution where the phrase the people is used, and it refers much more narrowly to related citizens. I know of amendments where person is used, and it's a different idea, but with the people in the first, second, amendment, fourth, is pretty well, from all the stuff I read, similarly used. It's just how we determine what the people is or is meant to be. So I'm having trouble with the law-abiding responsible citizen. I'm having trouble with the virtuous citizen, which you argue in your brief. You say many times being members of political community is a requirement for being of the people. You have to be a virtuous citizen. So would an alien who is rightfully here have Second Amendment rights under that definition? I think there's a stronger argument to be made that an alien who is in the United States legally, lawfully, would have a stronger claim to rights. Are they virtuous citizens? No, they're not citizens. Well, then I would trouble with your definition about citizens. Fair enough. I take the court's point. I think what the Fourth Circuit did was to acknowledge that, and the Fifth Circuit as well, was to acknowledge that it's possible that the phrase the people does not have one single definition throughout the Constitution. For example, in Article I, Section 2, and in the 17th Amendment, the Constitution says that senators and representatives are elected by the people of each state, and we know that at the time those provisions were enacted, the people of each state, number one, meant different things. State by state. And number two was really about citizenship, property ownership, and those who are eligible to vote. So we know that that's a very narrow definition of what the people is. Well, the only reason I'm giving you questions is there's some parts of your argument I had a tough time putting into my thought processes here. I mean, I read Verdugo and it was pretty straight what it had to be from Verdugo. Then it said the first, the second, and the fourth are all the same. We're not going to deal with the fifth. We're not going to deal with the fourteenth. We're going to deal with the first, second, and fourth. And then it tried to lay out the reasoning as to how one gets there, and it gave us two prongs. But it didn't seem like you really focused on the two prongs. That's what I'm trying to get you to do. Because it seems to be there have been courts which have said an alien gets a connection if they're an LPR. We have got courts saying an alien gets a connection. We might even go so far as some courts saying if they've even applied because they might meet the connection. And to happen in this case, is being here a sufficient time enough of a connection? I think that is not the only factor. No, I'm not talking about the only factor. I'm talking about is the substantial connection. Because if I read Verdugo literally, it seemed to me that this court said he wasn't here very many days. Well, I think with Verdugo, actually, he wasn't here voluntarily either. Well, but he was here voluntarily for some period of time, but not many days. Then he went back to Mexico, and they went and got his stuff in Mexico. And they said he had no connection. So I'm saying to the government, is the day is enough? I don't think it is. And the reason I don't think it is because in this, in United States versus Mesa Rodriguez, when the Seventh Circuit applied this test, it noted significantly that Mr. Mesa Rodriguez had been in the United States for, I think, 22 years consecutively. He was established substantial connections, not only by the number of years he was here, but by the fact that they were consistent. He never left. And he had engaged in employment and had other connections with the United States that Mr. Torres, as the court pointed out earlier, did not demonstrate. Or you're saying it has to do with factors like whether how, what he did while he was here, how long he was here, or does it have to do with his status? I think it's both. We start with the fact that he did not have legal status. Now, tell me, because the next case won't be the next case today, but it'll be the next case on another calendar. I'll have somebody who is an alien who will be asking me to explain. We don't exclude it just because it's taken in violation of the Fourth Amendment. We only exclude it if it's taken and it is so obvious it was a violation that is extreme, then we exclude it. If we use that parlance in the alienage proceedings before us, does that say that they have a Fourth Amendment right? Well, I don't know that Verdugo actually concludes. Verdugo doesn't conclude it, but I'm just trying to reconcile now my precedent, which is that if it's an extreme deviation of Fourth Amendment rights, I will exclude the evidence in a deportation hearing. I think in a deportation hearing, the context is different. It's a civil proceeding as opposed to a criminal proceeding, and the exclusionary rule would be applicable whether in the context... Are we in a criminal proceeding? Correct. So wouldn't we necessarily then have a Fourth Amendment right in this proceeding? And if we have a Fourth Amendment right, why not a Second Amendment? Well, I think that's what the court in the Fourth Circuit was trying to distinguish, which was that there may be rights enjoyed by unauthorized aliens under some amendments, but the fact, the Fifth Circuit said this too, the fact that the phrase the people is used in those three amendments of the Bill of Rights does not necessarily mean it has to have the same definition. And so instead of simply looking at the two words, the Fourth Circuit and Heller as well performed a historical analysis of what that right was, what was the right to bear arms at the time of the Second Amendment. And I think if the words of the people were not in the Second Amendment, I think it's pretty... I think... Well, unfortunately, it wasn't as clearly written one way or the other, but I think the scholars that we've cited in our brief and the literature, as well as the opinions in Heller and in Carpio Leo, make it pretty clear that the right to bear arms was something that was very routinely associated, not only with citizenship, but with membership in a political community, and that it was a right, like a civic right, similar to the right to vote. Thank you. Thank you. Please just hold your stance a minute. Unless you argue...
judges: Kozinski, N.R. Smith, Gleason